In re George Louis SOURAS, t/a Commonwealth Striping Company, Liberty Zaharis Souras, Nicholaos M. Kafantaris, Judy S. Kafantaris, Bankrupts.

Bankruptcy Nos. BK–76–732–R, BK–76–733–R, BK–76–1042–R and 77–00064.

United States Bankruptcy Court,
E. D. Virginia,
Richmond Division.

April 19, 1982.

Michael L. Soffin, Christian, Barton, Epps, Brent & Chappell, Richmond, Va., for George Louis Souras and Liberty Z. Souras.

Tommy P. Baer, Baer & Neblett, Richmond, Va., for Nicholaos M. Kafantaris and Judy S. Kafantaris.

Stylian P. Parthemos, Bambacus & Parthemos, Richmond, Va., for George N. Spanos.

## MEMORANDUM OPINION

BLACKWELL N. SHELLEY, Bankruptcy Judge.

These matters come on upon the reopening of the above-styled bankruptcy cases and the filing of applications by George L. Souras, Liberty Z. Souras, Nicholaos M. Kafantaris and Judy S. Kafantaris to amend their bankruptcy schedules to add creditors whose names had been omitted. The Sourases seek to amend their petitions to include Charles W. Carneal, George Spanos and Nicholaos and Judy Kafantaris as creditors having unsecured claims without priority. Nicholaos and Judy Kafantaris seek to amend their schedules to include Charles W. Carneal and George Spanos, also as unsecured creditors. George Spanos has objected to the proposed amendments to the schedules. After hearing and oral argument and upon the submission of briefs this Court makes the following determination.

## STATEMENT OF THE FACTS

On March 14, 1973 Nicholaos Kafantaris and George Souras leased property located at 306 West Grace Street in Richmond, Virginia from Charles W. Carneal for the purpose of establishing a restaurant trading as the Jefferson Inn. Their wives, Judy Kafantaris and Liberty Souras, signed the lease as guarantors. Several months later, on June 7, 1973, Nicholaos Kafantaris transferred his interest in the Jefferson Inn to George Souras and the Sourases agreed to indemnify Kafantaris from all debts, claims and demands as a result of the obligation. The Kafantarises were not released, however, by Carneal as obligors under the lease.

Shortly thereafter, on October 25, 1973, the Sourases also left the restaurant and assigned both their existing and future leases to Penny-Ette, Inc. Again, no release was granted by Carneal to the obligors on the lease. In 1976 and early 1977 the Sourases and Kafantarises filed petitions in bankruptcy. Each omitted from his schedule the liability for rent under the March 14, 1973 lease and the Sourases omitted from their schedules the potential liability for the indemnity agreement they entered into on June 7, 1973 with the Kafantarises. The Sourases received their discharges in bankruptcy on September 10, 1976. Nicholaos Kafantaris received his discharge on March 7, 1977 and Judy Kafantaris was discharged on April 8, 1977.

Of the four bankruptcy cases only the liquidation of George Souras's estate produced any assets. His estate produced $85.59 in assets and his creditors received no dividends from the estate.

Carneal sold the premises on September 30, 1977 to George N. Spanos. The sublessee tenant ceased paying rent shortly thereafter and in 1979 Spanos demanded payment of that rent from the Sourases and the Kafantarises. Spanos filed suit and obtained a judgment in the General District Court of the City of Richmond on June 30, 1980 against all four bankrupts in the amount of $4,500.00.

The Sourases testified at trial that they failed to include the debt to Spanos in their bankruptcy petitions because they had forgotten about their liability. The Kafantarises testified that when they prepared their bankruptcy schedules they did not realize that they were still liable under the lease to Carneal and that their attorney had a copy of the lease and they assumed he included on the schedules all of their liabilities.

In July, 1981, this Court granted the Debtors' applications to reopen their bankruptcy proceedings for the purpose of including debts omitted from their schedules. Shortly thereafter the Debtors filed a petition seeking leave to amend their schedules. The Court set September 2, 1981 in the Sourases' cases and September 28, 1981 in the Kafantarises' cases as the last day for the filing of objections to discharge and complaints to determine the dischargeability of debts claimed to be nondischargeable pursuant to clause (2), (4) or (8) of § 17a of the Bankruptcy Act.[1]

## CONCLUSIONS OF LAW

The Sourases and the Kafantarises now seek leave from this Court to amend their bankruptcy schedules to include this debt to Spanos. Spanos objects to the Debtors' request to amend their schedules arguing that the Court erred in reopening the Debtors' bankruptcy cases, that leave should not be given the Debtors to amend their schedules, and that the debts the Debtors seek to add to their schedules are nondischargeable in bankruptcy pursuant to 11 U.S.C. § 35.

Section 2(a)(8) of the Bankruptcy Act provides in pertinent part "... courts of bankruptcy ... may ... reopen estates for cause shown ..." and Bankruptcy Rule 515 provides that "[a] case may be reopened on application by the bankrupt or other person to administer assets, to accord relief to the bankrupt, or for other good cause." The Advisory Committee for Bankruptcy Rules notes that relief to the bankrupt is explicitly recognized as proper cause for reopening a bankruptcy case and that whether to open a case remains a matter of discretion with the bankruptcy court. Bankruptcy Rule 515 coupled with the policy of bankruptcy law to provide bankrupts with a fresh start in life, support reopening cases if relief to the bankrupt may be provided thereby. *In re Castleberry*, 3 B.C.D. 6, 7 (Bkrtcy.N.D. Ga.1977). Amending these schedules clearly would provide the bankrupts relief. Note also that Bankruptcy Rule 925 provides that the one-year limitation of Rule 60(b) of the Federal Rules of Civil Procedure does not bar an application to reopen a case under Rule 515.

1. This proceeding is governed by the former Bankruptcy Act because the bankrupts' petitions were filed before October 1, 1979, the Bankruptcy Reform Act's effective date. All references will be to the repealed Act.

Counsel for Spanos argues that Bankruptcy Rule 110 provides that a debtor may amend his bankruptcy schedules only before a case is closed for the first time and that the rule is inapplicable in instances in which a case has been reopened. Spanos cites *In re Gershenbaum*, 598 F.2d 779 (3d Cir. 1979) to support this conclusion; however, *Gershenbaum* does not stand for that proposition. In *Gershenbaum* the court concluded that bankruptcy courts do not have discretion to deny debtors leave to amend their schedules prior to the closing of a case and that Rule 110 requires courts to allow amendments "as a matter of course." *Gershenbaum* at 781. The *Gershenbaum* court did not face the issue whether a court has discretion to permit the reopening of a closed case to allow a bankrupt to amend his schedules. Courts generally construe Rule 110 as providing debtors the opportunity to amend their schedules subject to the discretion of the court even after a case has been closed.[2] *See In re Benak*, 374 F.Supp. 499 (D.C.Neb.1974); *In re Fortin*, 3 B.C.D. 72 (Bkrtcy.S.D.N.Y.1977).

█ Bankruptcy courts as courts of equity may allow the amendment of schedules in the absence of fraud or intentional laches on the bankrupt's part in order to fulfill the goals of the Bankruptcy Act. *In re Fortin* at 73. *See also, Pepper v. Litton*, 308 U.S. 295, 305, 60 S.Ct. 238, 244, 84 L.Ed. 281 (1939). Courts have established the exceptional circumstances test in determining whether amendments should be allowed. *Benak* at 500. *See also, Robinson v. Mann*, 339 F.2d 547 (5th Cir. 1964). "The exceptional circumstances usually require that the case be a no-asset one; that there be no fraud or intentional laches; and that the creditor was omitted through mistake or inadvertence." *Benak* at 500. Absent the showing of any real harm to the creditor or design on the bankrupt's part to defraud or cause delay, courts should not deny bankrupts the opportunity to amend their schedules solely because of a speculative proce-

dural harm to the creditor. *In re Callaham*, 3 B.C.D. 501, 502 (Bkrtcy.Or.1977). The real harm mentioned here is the harm that would arise out of the creditor's failure to share in a distribution of the bankrupt's estate or to be able to object to a discharge or file a complaint to determine dischargeability of its debt.

█ Spanos has failed to show he will suffer any real harm in the instant case if the bankrupts are allowed to amend their schedules. The record indicates that three of these bankruptcy cases were no asset cases and that the liquidation of George Souras's bankruptcy estate produced $85.59. No assets were available for distribution to creditors. The bankrupts entered into the lease on March 14, 1973. The bankrupts filed their petitions approximately three years after they left the Jefferson Inn. Although bankrupts are responsible for listing their creditors on their schedules and this Court takes a dim view of a bankrupt's failure to do so, the bankrupts' omission of this liability is understandable, given the lapse of time between the vacation of the premises, the assignment of the lease and the filing of their petitions.

One policy of bankruptcy law is to provide bankrupts with fresh starts in life. *Local Loan Co. v. Hunt*, 292 U.S. 234, 244, 54 S.Ct. 695, 699, 78 L.Ed. 1230 (1934). A debt of this magnitude would have been burdensome to the bankrupts and it would interfere with the law's fresh start policy. Spanos argues that because of the bankrupts' failure to list this debt the owner of this debt lost his opportunity to participate in the administration of the estates and thereby lost the chance to discover assets for the estates or to discover evidence which may have resulted in the bankrupts' discharges being denied. This harm is purely speculative and is insufficient. *See Callaham* at 502. Spanos also argues that laches precludes the bankrupts from amending their schedules because the bank-

---

**2.** Closing cases is an administrative function of the Bankruptcy Court Clerk's Office. The office selects the closing date according to its routine procedures and without notice to any party in interest. This date is chosen arbitrarily for the convenience of the Clerk's Office and should not be used to unduly prejudice the bankrupts.

rupts knew of Spanos' claim for nearly two years before they sought to reopen their cases. It is clear from the testimony that the bankrupts were unaware of their right to reopen their bankruptcy cases to amend their schedules until just two months before the August 27, 1981 hearing.

Several bankruptcy courts have concluded that they have no discretion to allow the reopening of bankruptcy cases after a six month to one year period in order to allow bankrupts to amend their schedules. *See Broomfield v. Wallach*, 3 B.C.D. 760 (Bkrtcy.S.D.N.Y.1977); *In re Bonder*, 2 B.C.D. 353 (Bkrtcy.E.D.N.Y.1976); *In re Farmer*, 2 B.C.D. 1533 (Bkrtcy.W.D.Pa. 1976); *In re Perucci*, 1 B.C.D. 998 (Bkrtcy. E.D.Va.1975). These courts appear to be in the minority. The exceptional circumstances test as originally enunciated in *Robinson* is followed by a majority of the courts.

When Spanos purchased the premises from Carneal in 1977, each of the bankrupts had already received his discharge in bankruptcy. Shortly thereafter, the sublessee ceased paying rent to Spanos; however, Spanos did not seek to recover the arrearages in rent from the bankrupts until some point in mid or late 1979. Considering all of the facts herein this Court chooses to exercise its equitable discretion and permit the bankrupts to amend their bankruptcy schedules.

Spanos having been granted an extension of time for the more important right to object to the discharge or to file complaints to determine the dischargeability of his debt and having failed to establish any reason why the bankrupts should not be denied a discharge or why this debt should not be dischargeable in bankruptcy, the relief requested by the bankrupts should be granted.

An appropriate order will issue.